My name is Dario Borgeson and I represent the State of Alaska. I'd like to reserve 10 minutes of my time for rebuttal if I may. The issue in this appeal is whether the USDA's reasons for exempting the Tongass National Forest from the Nationwide Roadless Rule satisfy the APA. The State of Alaska's position is that they do. From the beginning of its development of the National Roadless Rule, the USDA gave special consideration to the Tongass National Forest. In both the proposed version of the Roadless Rule and in the draft EIS, the agency's preferred alternative was to not apply the Roadless Rule to the Tongass immediately, but to defer the decision of whether to do so until a later date. The USDA ultimately decided to apply the rule despite acknowledging the steep socioeconomic costs for the isolated communities in the Tongass that depend on the timber industry. Can you talk to us a little bit about standard of review? Yes, Your Honor. The standard of review here is de novo for the district court's decision, but for the agency's rulemaking... Yes, I'm sorry. I should have made it clear. Obviously it's de novo with respect to... So we're in the same position in the district court. Correct. But how do federal courts review such a decision by the agency given what is an about face in its policy? Well, the courts, to begin with, give deference to the agency's decision-making in the area of fundamental policy. We're in Chevron land, right? Chevron land, yes, but also just generally under the APA. Deference applies so long as the decision is reasonable, so long as the reasons are articulated, and so long as... There's some implication in our case law, there's some implication that when the agency does an about face, the review is more searching. Do you agree with that? Not necessarily. In the FCC, the Fox television station's case in the U.S. Supreme Court, there was basically a 5-4 decision in the U.S. Supreme Court where the majority rejected the proposition that when the agency does an about face, the agency necessarily has to provide a more robust explanation for what it's doing. It suffices that the agency recognize that it's changing course, that it provide adequate justifications for the courses chosen. And in the case where the new course necessarily contravenes factual findings underlying the previous rule, then it may have to provide more of a justification for that. Well, does something else have to happen? Because in this case, the USDA used the same data from both the 2001 ROD and the 2003 ROD, right? And so in light of this, would Fox television apply? I mean, nothing else really happened. They just basically said, we changed our mind. Yeah, and that's because it's basically a fundamental policy choice by the agency. The prior administration valued the incremental environmental protections of the RODIS rule over the socioeconomic costs that it would cause. And then the new administration took another look, and it decided that the incremental environmental protections on a forest that already has abundant RODIS values So kind of like judges? Like judges. Two administrations can see things differently. Why doesn't that trigger the Fox rule, getting back to Judge Kaczynski's question? Because the agency I didn't ask a good question, forgive me. I mean, why doesn't it trigger the exception to Fox, where they do have to give a more searching, more detailed look? Because the agency is looking at the same facts, and it's simply valuing the balance differently. And it's not necessarily I'm sorry, finish your answer. It's not necessarily, it's not contradicting the factual findings that underlay the original decision. It's simply saying we value the socioeconomic health of these communities more than the incremental environmental benefits that the RODIS rule would create in a forest that's already abundantly protected. So is it your position that the agency can change its mind based upon the same data without giving any reason? Well, I think that that is the reason. The reason is the devaluing of the policy considerations differently. And, yes, I think that is consistent with the Fox television station's case. The agency acknowledged that it was charting a different course, and it looked at the socioeconomic costs versus the environmental benefits that underlay the RODIS rule. And it said, we want to strike a different course, and we're going to value the jobs. So isn't this really a case that says that elections have consequences? So on the one hand, you have some data about socioeconomic matters, for example. And the Agriculture Department under President Clinton and under his executive order had one perspective. When President Bush came in, he issued a different executive order. The same data produced a different result because of a different perspective. After the case was filed, President Obama came in, and the Agriculture Department did an appeal because it had a different perspective. Isn't that really what we're dealing with here? I would say that's exactly what this case illustrates, is that this is why we have elections. The executive branch can come in after election and weigh the benefits and the costs differently depending on what that administration values. And if they do that, is that sufficient under Fox to justify the change? In other words, if an administration says it's a matter of policy based upon these facts, we view them this way. If we look at what the Rod said to that effect, is that not sufficient under Fox? Assuming the same facts, the same materials that were looked at, is that not sufficient under the law to justify the decision? It is sufficient under Fox television stations. And if it weren't, then the courts would be creating basically an impediment to the exercise of democracy by making a new administration justify its policy choices, which, based on the same facts but different values, would have to justify those values more robustly than the original administration did. Even if there's a policy change, doesn't Fox require at least a rational explanation of a policy change? Fox doesn't just allow you to say, never mind, we've chosen a different policy and we don't have to tell you why, does it? Well, that's correct, but that hasn't been supplied in this case. I'm wondering about that. I see two sort of findings in the second Rod. One is we're doing this because we want legal certainty. With respect, that strikes me as just silly. There's been some attacks on the national roadless policy, roadless rule, and you make an exception in Alaska to get national legal certainty. That strikes me as incredibly implausible. And then there's a finding that says in the first one, the Tongass exemption, we considered it, but it would pose a serious risk to roadless values, which I assume means environmental concerns and other concerns. And in the second one, it says, oh, no, the Tongass exemption perfectly protects roadless values. Why aren't those contrary factual findings? I wouldn't have any problem if the administration said we just care about the environment less than the other guys or we care about jobs more than the other guys. So we've arrived at a different conclusion. But this purports, this second R.D. purports to make findings that strike me as not supported by the record. Well, I want to address the legal certainty rationale first. I think that's not exactly the rationale that the agency itself was offering for the change. As the panel majority pointed out, it wasn't legal certainty overall. The purpose of this Tongass exemption rulemaking was to end litigation with the state of Alaska. Well, no, all you promised was a proposed rule, and this ended litigation with the state. It made you the defendant, not the plaintiff. That's true. Everybody knew the litigation was going to continue. That's true. If you look at the rule and the preamble to the rule, the USDA discusses the state of Alaska's lawsuit and the ANILCA claim extensively. And then when it's discussing the ANILCA and TTRA claims in more detail, the agency says that exempting the Tongass from the roadless rule is the best approach to implementing not only the spirit but the letter of those statutes. And that's the circumspect way of saying that the agency had viewed the state of Alaska's lawsuit based on ANILCA and TTRA as having some merit, the agency has some legal exposure, and so the agency decided to settle that case with this rulemaking. And it's true that the agency did not promise the result. Just promised to propose a rule. That's true, but the state of Alaska, its case was dismissed without prejudice. And it expressly states in the settlement agreement that if either party were unhappy with the substantive result, meaning if the state of Alaska were unhappy with the substantive result, it could refile its lawsuit at any time. Could you turn to the second part of that? The first ROD says that the Tongass exemption poses a serious risk to roadless values. The second ROD says that the Tongass exemption protects roadless values. Aren't those dramatically opposite conclusions? Well, I don't recall the first ROD saying the Tongass exemption. Well, it says allowing road construction on the Tongass National Forest to continue would risk the loss of important roadless area values. That's the first ROD. It's 66 FR at 3254. The second one says the Tongass Forest Plan adequately provides for ecological sustainability. Aren't those two just dramatically opposite conclusions? Not exactly, because the optimal level of roadless values is, again, a policy judgment. The original ROD said exempting the Tongass from the roadless rule would risk the loss of some roadless values. And that's true. And I don't think that the 2003 ROD denies that. But what the 2003 ROD is saying is that even with exempting the Tongass from the roadless rule, there still are abundant roadless values. And the ROD goes on to look at what would happen if logging were allowed at the maximum amount under the existing forest plan for 50 years. And it says that 80 percent of existing roadless areas would still be in essentially their natural state after 50 years. And it decides that that is an adequate protection, that's an adequate level of roadless values, giving the countervailing costs to socioeconomic communities of providing absolute protection. Counsel, let me ask you this to follow up on Judge Hurwitz's question. Let's assume, arguendo, that of the reasons given by the Department of Agriculture and the ROD, that our panel were to conclude that some say three, some say four, whatever it is, say that two of the reasons given didn't pass muster and were arbitrary and capricious, but two did. Is that sufficient to justify and sustain the ROD? In other words, must all the reasons given by, in this case, the Department of Agriculture, pass the arbitrary and capricious standard, or is it sufficient that any one of the stated reasons be sufficient? It's sufficient that any one of the stated reasons pass muster, because in that case, then the federal government's action still has a reasonable basis. It's still supported by the record. And I want to point out that this case is not like the cases cited in the petition for en banc review. Those cases either involve a factual error that infected the entire analysis, or they involve agency actions where no valid justification was offered at all. And so in those cases, you can't really say that there's a reasoned basis for the decision. But here you can, even if one reason doesn't pass muster. What about, unfortunately, the USDA is not a party to this appeal, so we can't really ask the USDA what they meant. But what do you believe the agency meant when it stated it changed its policy, quote, in light of litigation over the last two years? Was it meant to be stand-alone justification for its decision, the trigger for consideration of other issues such as socioeconomic hardships, or was it something else? The ending the litigation with the state of Alaska, which is I think pretty clearly what that reference to litigation is talking about, is a stand-alone reason for this action. I want to explain why that's reasonable. If the lawsuit went forward and there was an adverse ruling, adverse for the Forest Service on the meeting of ANILCA or TTRA, that could have repercussions for Forest Service and other federal agencies' management of lands in Alaska. And that's why there was, so there was a little more skin in the game than just this policy, and that's why it was reasonable for the state, excuse me, USDA, to decide that even settling this lawsuit alone would be a reasonable basis for the decision, given the fact that the roadless values of the Tongass are still adequately protected under the existing Forest Service. I have a question for both you and for Mr. Waldo when he gets up, and I'm referring to ER 81, which is the 2003 record of decision. And there's a fairly extensive discussion of the two statutes that Congress enacted specifically pertaining to Alaska, that is ANILCA and the Tongass Timber Reform Act. And the agency talks about the fact that Congress had made the determination when it passed ANILCA in 1980 that the preservation of 5.5 million acres out of the 16.8 million acres in the Tongass was sufficient for conservation purposes, and that under the 1990 TTRA, because this is a multiple-use forest, the land had to be managed in such a way as to provide an adequate timber supply. Does that, in response to Judge Smith's question, establish at least one legitimate justification for the change in policy here? It does. The agency is pointing out that this is exempting the Tongass is the best way to implement congressional direction and intent in those statutes. I think that that rationale and settling the state of Alaska's litigation are intertwined because the state of Alaska's lawsuit was based on the statutes. But, yes, carrying out congressional intent is certainly an adequate reason for an agency to take a new course and to chart a new policy. Well, I was particularly struck by the language when they talk about ANILCA, once Congress made this determination that the land was sufficiently protected. And then the agency goes on to say, and that no further administrative withdrawals could be allowed without express congressional approval. And wasn't the effect of the 2001 record of decision to do what Congress said could not be done without congressional authorization? And that is the state of Alaska's position. The state of Alaska is involved in another litigation in the D.C. circuit right now where the state is making exactly those claims that the Tongass exemption violates ANILCA and violates the TTRA. That wasn't settled. No, that one wasn't. We didn't do away with all this litigation. Well, that one was filed in 2011 after the plaintiffs in this case filed their lawsuit and the Tongass exemption was struck down by the district court in Anchorage. So after that, after the whole relief was gone, the state of Alaska filed its lawsuit in the D.C. circuit. So, yes, things turned out differently. Can I ask you to return to Judge Smith's question? Let's assume there are two valid reasons and two invalid reasons for a second. I need to add them up. But do our cases suggest that we apply harmless error review rather than just saying one good one is enough? I know the argument you make is that one good is enough, but I thought our case law said that when an agency promulgates a regulation and has an arbitrary reason or an unsupported reason and a good reason, we look to see whether or not one infected the other, whether there's harmless error. Well, not exactly because those cases, again, that were cited in support of the en banc petition, none of them are like this. None of them offer two separate rationales for a course of action and one is struck down. Again, they have factual errors that infect the entire analysis, or one of them involves, it's a Bureau of Prisons rule that makes certain prisoners ineligible for early release. And the Bureau of Prisons actually offered no policy justification at all for why it chose specific. I guess I'm asking a slightly different question. I'm interested in whether you have any authority for the proposition that if there's one bad reason and one good reason, that we ignore the bad reason entirely without trying to figure out whether it somehow affects the good reason. Well, in this circuit I do not, but the Bowman transportation case that the panel majority cited from the U.S. Supreme Court. That was the FCC case? Well, ICC case. Can I follow up on that same line of questioning? Let's assume we have a good reason and a bad reason. And we put to one side the bad reason. How do we know that the good reason is enough to support the agency in the sense that the agency would have made this decision if it had only had the one good reason? Well, you might not know for certain, but it is the plaintiff's burden to show that the error wasn't harmless. And here there's no indication that the agency wouldn't have gone through with, wouldn't have sought this result if only one of those reasons were. It's difficult to say because the agency believes the reasons at the time. And it's not thinking about, well, if the court later thinks that one of those reasons isn't good enough, would we do it the same way? The agency believed those reasons. And so that should be enough to infer that the agency is still going to do the same thing, even if the court decides that one of those reasons isn't well articulated enough or isn't adequately supported by the record. And I would also point out that it doesn't seem consistent with the deference due executive branch policymaking for a court to strike down a rule that has inadequate justification. Can I ask you, along that line and following up on Judge Fletcher's decision or question, rather, in the Fox case the court said the court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned. Does that have any bearing upon this case? Well, yes, it does. And I think you can look at why the agency did, took the course of action that it did. And if the court finds that one of the reasons isn't good enough, you still can identify why the agency chose this course of action. And that action does have a rational basis and is supported by the record. What do we do, if anything, with the fact that the agency has not appealed to us? I don't think you can make it. Well, you can draw all kinds of inferences from the agency's absence today, but none of those inferences are relevant to whether the decision at the time was well supported and was well reasoned. It simply has what the agency does today has no bearing on what happened at the time. And the agency, just as the agency can't backfill reasons for inaction, it also can't retroactively undermine reasons that were valid simply because it may not prefer the policy outcome now. It always has the opportunity to do a new rulemaking if it likes. That's a different administration, right? It is. And it has an opportunity to do a different rulemaking if it likes. But it certainly can't undermine the rationality of the rule by its future actions. Counsel, I'd like to go back to Judge Tallman's question about the ANILCA and Tongass Timber Reform Act, because those weren't new in 2003. And you argued a minute ago that the exemption was consistent with congressional directives. And I think you're citing the TTRA and ANILCA. What about the fact that in 2001, the record of decision said that that was consistent with implementing congressional directives? Well, yes. In 2001, the agency said this is consistent with TTRA. In 2003, the agency said, well, this is the best way to implement not only the spirit but also the letter of the law. And it's true that the agency didn't say our prior course of action violated ANILCA. But the agency is ‑‑ when the agency is talking about the possibility that its actions might not be consistent with the law, it's going to be pretty circumspect in explaining that. Imagine if the ‑‑ Well, it's pretty tough because they're not here again. But now it seems to me that you're doing sometimes what you don't want us to do, and that is stepping into the agency's shoes and asking us to guess what the agency was thinking. The record, it seems to me, says that they thought in 2001 this was consistent with congressional objectives, and in 2003 that the opposite was consistent with congressional directives. Well, and given the range of discretion that's available under those statutes, that may well be possible. I would say that the agency in 2001 said this is consistent with congressional directives, and in 2003 it's saying this is a better implementation of congressional direction. If we were to reverse the district court on the APA claims, what would be your position of whether we should address the NEPA claims for the first time on appeal? Well, the panel never reached that. The district court never reached that. I think it would be wise for the court ‑‑ well, obviously it's up to the court, but our preference would be to remand that to the district court for consideration. But I can address those questions. I mean, we could address it if we wanted. You certainly could because it is a question of law and we're on a summary judgment posture, but it hasn't been passed on by any court. What's the strongest support for this change of position? The strongest support is the socioeconomic considerations, I believe. Clearly the agency came in, it looked at a prior policy decision that valued additional environmental protections over jobs, and a new administration came in and it looked at that balance and decided to strike a different balance consistent with its values. But if that's the strongest one, if you read the district judge order, he says that the new ROD says 900 jobs are going to be lost, and the district judge finds that inconsistent with the record that was established the first time around. What do you do with that? Well, I think there are a number of problems with the district court's analysis of that. One, the district court really focused on the idea that this was a short‑term rule, but I think it was overlooking a few points. One is that while the agency did use the phrase short term in the rulemaking, there's actually a rule of indefinite duration, and it was certainly reasonable for USDA to think at the time that it might last a long time. Just to be sure I understand what you're going to say to him, did it not continue, the 2003 ROD continue until Judge Sedgwick overruled it? That's correct. So you had a period of what, not six years, seven years, something like that? Eight years. Eight years? Seven years. And there was reliance at some point, at least, by some people. There was, and actually, in front of the Ninth Circuit, when the RODIS, well, I'll leave that point. I think the other point that the district court missed is that not only is it reasonable for the agency to take a long‑term view when it's dealing with a rule of indefinite duration, but the rule also explained, the USDA also explained that the rule had separate utility in temporarily preventing socioeconomic dislocation in Southeast Alaska, regardless of what the agency ultimately decides. Now, it's true that the agency didn't attempt to predict the number of jobs that would otherwise be lost during the uncertain duration of this rule, but that's not really a fair criticism, because it would have been hard to come up with reliable short‑term job numbers for a rule of uncertain scope, and given the volatile nature of the timber industry. Just a clarification on the answer you gave to Judge Fletcher's question. We don't owe any deference to the district court on its determination about the jobs. That's correct, only to the agency. If we delve in and look at the record ourselves and determine what, what deference do we owe to the agency on that? That's correct. What deference? Step in their shoes. It must be big shoes, but we all step in the shoes of the district court, and then look at the agency record and ask ourselves what question? Is it supported by substantial evidence? What is the process we engage in? The agency's decision. Specifically on the question that Judge Fletcher asked about the jobs. The agency's decision has to be reasonable and not contrary to the evidence in the record. That's the standard. Not contrary. Not contrary. Not contrary, yes. I have 30 seconds, and if I may, I would like to reserve that short time. Thank you. Good afternoon. My name is Tom Waldo. I'm the attorney for the organized village of Cake and the other plaintiffs. In adopting the Tongass exemption, USDA relied on a series of findings about the roadless rules effects on community road connections, on utility lines, and on the timber industry. But a careful review of the record shows that each of these rationales was either contrary to the evidence before the agency or ignored an important aspect of the problem, or was contrary or contradicted previous agency findings without explanation. So how do we square that with the statute? The agency's determination clearly resulted in increased acreage set aside for conservation purposes when it cut the supply of commercially available timber from 4% to 2%, about 300,000 acres. Well, I mean, keep in mind that the roadless rule doesn't set aside lands for conservation purposes. It's still all of the normal uses are allowed on those lands still. And the only things that are prohibited, both with exceptions, are new roads generally with exceptions and logging generally with exceptions. But how do you square that? I'm referring specifically to that language that I quoted to counsel for the state at ER81 in the 2003 record of decision, that Congress had made the determination in 1980 that 5.5 million acres was enough, and that if there was going to be any further restriction for conservation purposes, congressional approval had to be obtained. Well, those were, okay, as to the, there are two things there. One is that the 5.5 million acres was enough. That's a provision of ANILCA that's in the policy statement about future congressional set-asides, future wilderness areas, parks, things like that. It doesn't have any application to this case, which is about an agency's management of multiple-use lands. The other one about withdraw, further withdrawals of land doesn't apply here because the roadless rule is not a withdrawal, and that was the holding of the court in Southeast Conference v. Veneman, which is cited in our brief. And I would point out that USDA has never wavered in its position that the roadless rule is fully consistent with both ANILCA and TTRA. It continues to defend that position today in its litigation. What if in the second ROD, a question that Judge Smith asked before, the second ROD just said, we value jobs more than we used to, and we value the environment less than we used to, and so we've changed our policy. Okay? Under Fox? Well, that's a question that goes right to the heart of it. Yes or no? It's, if the USDA tried to hold out its decision as if it were doing that, but in fact. Now, put aside what they actually did. I'm asking you a hypothetical question. My question is what if decision number two, the second ROD, said exactly what I just said to you or words to that effect. We like jobs more than we used to, and we like the environment less than we used to. We're Republicans. They're Democrats. We have different policies, and so we're just switching policy course. Fox says that's okay, doesn't it? Fox says as long as the agency acknowledges that it's making a change and gives good reasons for the change, it can do that. Okay, so now tell me what you were trying to tell me a moment ago. Tell me why you didn't think that's what happened here. Well, when you look at the record, it's clear that the agency, that the fact that the agency kept, I'm sorry, the record that each of the agency's findings is either contrary to the evidence before the agency or. Did you say they found too much? Yeah. So let me give an example with roads and utilities, which is a particularly stark example. Can I just, because we're friends, you know, and we need to understand what we're talking about here. It isn't in fact what we're dealing with here, the very contest, if you will, between Justice Scalia and Justice Souter and Justice Breyer. They took one position on what the agency needs to do, and the majority, as it turned out, took a different one. The majority said policy is enough. You can do that. You have to acknowledge that you're making a change. They certainly did that here, did they not? Well, they acknowledged that they're making a change from applying the roadless rule to the Tongass to not doing so. But, for example, things they did not acknowledge are, for example, with roads and utilities, where in 2001 the agency looked specifically at the question of whether the roadless rule would block any new road or utility lines, connections in the Tongass. But I thought they extended that out and specifically said that they knew that that was the case. No, in 2001 they looked and found that it was not going to block any future community road connections or utility lines. Right, but the 2003 pretty much acknowledged the same, right? No, quite the contrary, Your Honor. The 2003 record of decisions says that the USDA came to just the opposite conclusion and said that the roadless rule significantly limits the ability of communities to develop road and utility connections. Perhaps we read them differently. I thought that the 2001 was talking about the fact that the law permitted interstate highways and public highways of significant size to go through, and that was not affected, whereas the 2003 rod was talking about smaller roads with access to some of these smaller communities. I think there were like 33 communities or something like that that might have benefited from smaller, more individualized roads, if you will. No, that's not correct, Your Honor. In 2001, or 2000, when the Forest Service looked at this question, it specifically looked, and there's a document in the record, supplemental excerpts of record, page 168, I believe, where they looked to see, is there any way that the roadless rule would block any community access roads? And they found that it would not, that the communities that are not connected by roads right now are extremely remote and isolated, and the only way they would ever likely be connected would be through the construction of federal-aid highways. That's a very good example that gets back to what Judge Hurwitz and I and others have been concerned about here. Let's say you're right about the roads, but let's just say that they said enough about the socioeconomic differences, policy differences, admittedly. Isn't that enough under Fox for the rod to survive? No. And why? Well, what happened here was that they made a completely different finding. They went from finding it would have no effect on the ability of communities to develop road connections. Forgive me, counsel. I'm conceding that for purposes of our discussion. Let's say you're right about the roads. All right. But let's just say that another part of the rod, that they did what they needed to under Fox, isn't that enough if there is at least one valid reason which would have allowed them to sustain the rod for that to succeed or to survive, if you will? Well, no. Then you get into the harmless error analysis. So the way that this Court resolves the question, if, for example, you've got some rationales that are arbitrary and others that are not in support of the Tongass exemption, you look at whether the errors made were harmless or not. Doesn't that get into policy again? No. This is a long line of cases about harmless error analysis. And in these circumstances, under those cases, this Court will only uphold the Tongass exemption if it makes a finding that the errors it identifies in the agency's reasoning clearly had no bearing on the agency's decision. That's the standard. Let's take socioeconomic. They looked at the same facts, basically, and they viewed them differently. And they said so. That's one issue. Let's just say, hypothetically, that from a policy perspective, that's entirely consistent with the Bush administration's position. Under those circumstances, unless you go to a policy analysis, why wouldn't that be harmless error? Because you may not agree with it from a policy perspective, but it is rational that to use Judge Hurwitz's perspective, that they valued the jobs more than the previous administration did. I'm not saying they didn't. Let's say they did. You would have to then find that the error about going from saying it had no effect on Rhodes to saying it has to do with the agency. Go back to Rhodes again. I'm talking socioeconomic. I know they're somewhat tied. But what I'm suggesting is that you'd have to find that those errors clearly had no bearing. So even if they were right about or within their rights about certain policy determinations, you'd have to find that the errors clearly had no bearing on the agency's decision. And that finding is not possible in this case. But isn't that contrary to Fox? Didn't Fox say that if they acknowledge they're changing policy, they say we're not doing the same thing. And clearly in this rod it says we're going forward with this rule for these things, three things in that particular point. And one of them is socioeconomic. They state why. They state their interpretation of the socioeconomic data. The fact that that disagrees with what a previous administration's interpretation on that data might be. They've explained it under Fox, have they not? No. Okay. Why is that? Okay. So they haven't even acknowledged the change. That's the problem. So I'm going to go back to Rhodes. But finally they've acknowledged the change. They're saying this is a change. Well, they changed the rule. Well, that's what Fox says they've got to acknowledge. They know they're changing something that existed before. I want you to get to Rhodes. But I really don't see how there can be any doubt that they knew they were changing something. The bottom line is that the roadless rule was not going to apply to this particular forest. Well, of course they acknowledged that that was the change. But they stated in the record of decision the roadless rule significantly limits the ability of communities to build roads. That was a significantly changed finding from what the agency had found in 2001, but it's not acknowledged in the record of decision. If you read the record of decision – I'm reading it. And I'm looking at the relevant paragraphs. And they talk about why they think that it has an impact. So tell me where it is that it falls short. Is your argument, counsel, that they have to say that in 2001 we looked at data X, let's say the jobs data, and not only were we changing the roadless rule from a roadless rule to an exemption or the other way around, but they're looking at the same data and they're reaching a different conclusion? Do they have to say that? That's exactly right, Your Honor. That's exactly what I'm trying to say. Here, in the record of decision, you don't realize that the agency is completely changing its analysis of the jobs. You don't realize that they're changing their analysis. Why can't they simply just engage in a different analysis? Where does it say that they have to say mea culpa? Under FOX, FCC v. FOX Television, the agency – I'm sorry. Where in FOX? Tell me where. Is this the FOX exemption or exception, I should say? Is that what you're relying on? I'm relying on FCC v. FOX where it says – Why don't you read?  I'm sorry. I don't have the case in my hand. In 515, there's language that says that they may need to provide a more neat, detailed justification of what would suffice for a new policy created on a blank slate. You came to court without FOX? When, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy. Is that the language you're relying on? Yes, that's correct. So for factual determinations, they have to give a more detailed justification. But only if there's a factual contradiction in the record. Thank you, Judge. Let me, for a moment, take you back to the social economic costs, which the state identified as being its most well-supported ground. Is there a factual contradiction in the record such that under FOX Television, USDA had to provide greater justification? Yes. Or on that ground alone, is it more of a policy choice, that the value they place on jobs is now different? Okay. So your question is about the social and economic effects, what the agency was referring to was not only jobs, but also these issues of building roads and utility lines for communities. That was the pool of social and economic effects that they were talking about. And, yes, there were factual changes. For example, whether the roadless rule would block new road development or not. They went from saying it excluded ______. Is that a fact or a projection to the future? There's a question there. Is that a factual finding or a projection into the future? I think it is a projection in the future about facts. Well, that's not the same thing as a finding, is it? They give the analysis. They discuss why it is they think the existing authority of the Secretary of Agriculture may not be enough. You may agree or disagree with the analysis, but they do give it, don't they? Well, they don't. Do they give an analysis? Do they give an explanation as to why they think the power of the Secretary of Agriculture to exempt Federal-aid highways isn't enough? They provide an explanation. So the answer to my question is yes? Yes. That was easy, now, wasn't it? Yes. I'm sorry, Your Honor. But what they still have not acknowledged is that that was a change. Let me make sure that I understand. But they give the explanation for why they think the rationale offered before fell short. What's missing here? No, no, that's not it. Mea culpa? Is that it? Is Judge Kuczynski on that? They're required to beat their chest and say mea culpa? That's what I'm answering no to. They didn't say why it's different from what was. What requires them to say what's different? You took my book, but you didn't come back with a page. I haven't had a chance to look down into the page yet. But on the very page that Judge Kuczynski. The mea culpa, what I was really asking about, and I think, and I'd like an answer to, is where does it say they have to say mea culpa? Or, you know, we did it wrong the last time. It's on the very page that Judge Crispin was reading from that I can't put my hands on. That page was 515. And what the agency says is, or what the court said, was an agency may not, for example, depart from a prior policy sub salientio or simply disregard rules. And, of course, the agency must show there are good reasons for the new policy. Okay. And the reason explanation for its action would ordinarily demand that it display awareness that it is a changing position. So when it goes from saying it won't affect community road connections to saying it will have a significant impact on that is a change in position and FOX requires the agency to display the awareness that it's changing that position. Look down to the last sentence of that paragraph. Look at the last sentence of the paragraph. It begins, in such cases, it is not that further justification is demanded by the mere fact of policy change, but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy. What facts and circumstances were disregarded? The fact that they could not identify even one example of a road or a utility line that would be blocked. How is that a fact that's disregarded? Is that in the prior policy? In the prior. And when they made their decision in 2001, they looked specifically at the question of whether there were any roads or utility lines that would be blocked by the roadless rule and found there were not. Then they went into 2003 and said, well, now there's going to be significant limits on it. And they offer an explanation for that. And what's wrong with the explanation they offer? You're coming back to saying they haven't said mea culpa, they haven't acknowledged the change. But they offer an explanation. What's wrong with the explanation? The Secretary's authority under the Federal-aid highway law, or under the roadless rule, is essentially the same as under the Federal-aid highway law. That was a finding that they made in 2001. It preserves the Secretary's discretion as it exists. And for some reason, in 2003, the agency finds otherwise and doesn't ever explain why it went from finding, doesn't even acknowledge it. It gives at least two explanations. It explains once that the Secretary's authority requires a finding that, quote, may not always be possible for otherwise desirable road projects, close quote. A paragraph later, it points out that most state highway additions have been upgraded from roads built to harvest timber, not just Federal highways but state roads, and that without the pioneering work done by the Foreign Service in building roads to harvest timber, it's unclear whether the state would have undertaken the construction. Now, you can agree or disagree with the proposition, but you can't tell me they didn't give some explanation. Well, it disregards the facts in the record, Bill. Let me address that latter point about the upgraded logging roads. Again, the Forest Service went and looked at that question in 2001 as a factual matter and said that all of the communities that still remain unconnected by roads on the Tongass are so remote and isolated that they wouldn't likely be connected by logging roads. They could only be connected if you constructed Federal-aid highways. And so that reliance on upgraded logging roads is a complete reversal in factual position. Is that it, or is it because of the isolated geography and the mountainous terrain that it's virtually impossible to economically build a highway? I mean, I realize we've spent funds on highways to nowhere in the Tongass, but that's a separate case. That's exactly right, and that's why you're not going to get logging roads going over ice fields or glaciers or across oceans to these islands. And you're not going to build a Federal highway to Cape because it's on an island. That's right, or if there were, for example, if you tried to build a road to Petersburg, it would likely be a Federal-aid highway. So let's go back to my timber question. How come reducing by half the amount of commercially available timber is not a socioeconomic cost on isolated southeastern Alaskan communities that are dependent for their wood supply on the Federal Government because it owns or controls 90-some-odd percent of the entire land mass of southeast Alaska? Well, let me address that question of the timber supply and timber jobs. The agency's consideration of that issue was arbitrary because it ignored the effect of a seven-year supply of grandfathered timber. USDA addressed the issue of the timber supply in the roadless rule. When it exempted from the rule 850 million board feet of timber that was already in various stages of preparation. The agency found that was enough for seven years of logging, even at the higher levels that prevailed at that time. So by the time the Tongass exemption was adopted, logging levels were a lot lower. It could continue indefinitely under the roadless rule with no further job losses. Now, USDA anticipated the possibility that the markets could bounce back again, but it completely ignored the 850 million board feet, seven-year supply of grandfathered timber. That timber, for the intended duration of a temporary exemption, was more than enough to allow for a complete resurgence of the timber industry and a recreation. If there was any timber industry left at the end of that time period, isn't that part of the problem? No. The only thing that would threaten the timber industry would be lack of adequate timber supply. This was a seven-year supply. Well, if all the mills have closed in the interim, I guess it's an academic question, is it not? The timber industry is, for all intents and purposes, gone. The issue was whether to adopt this temporary exemption, and for purposes of a temporary exemption, there was plenty of timber available. I don't know whether you've ever represented companies that plan for the future, but certainty is one thing they like to have as much as possible. If you have a rule of indefinite duration to which you make frequent reference, how can you plan to do anything? You hire a bunch of people, build a bunch of houses, and have them come out, and all of a sudden, bam, the rule's gone. You can't do it anymore. That's exactly the reason why the dependence on uncertainty as a rationale for the exemption was so arbitrary, is because it was only a temporary rule. You're talking about the legal point. I don't see that in the rod. I see that interpretation by what you've said and what the dissent says in our lower panel. They don't say they were looking for certainty. They just wanted to settle that particular lawsuit. There's nothing in there that says nothing else will happen in any other part of the country, is there? Well, what the agency said – Answer that question, please. It doesn't address other questions. It doesn't talk about anything else. It doesn't mean that they didn't think there would be other lawsuits. They just said that for purposes of this particular case, that they thought it was important to settle the Alaska lawsuit. That's all they talked about. They didn't say that all these other lawsuits were going to go away. Isn't that correct? Yes. Okay. But the reason they said they wanted to do that was to reduce the uncertainty and conflict resulting from these lawsuits in order to encourage and promote more investment in the timber industry, as you suggested. And the problem with that analysis is that it completely ignores the fact that it's just a temporary rule. I mean, the agency never explained how it was possible that a nearly temporary rule could reduce uncertainty. Well, isn't it a fact that the prior timber supply contracts had been 50 years in duration because it's difficult to get capital invested in mills unless you can be assured of an adequate supply of timber long enough to receive a return on your investment? Yes, that's right. Those contracts expired in the 1990s, and that's why it was so arbitrary for them to rely on uncertainty as a rationale for a temporary exemption. There was no way that a temporary exemption could reasonably promote greater certainty. So do you want a 50-year exemption for more certainty? No, that's not what we're asking for. We're just judging the rationale for the Tongass exemption by the reasons they gave, and the reasons they gave are not supportable. You made the reference to the 850,000 board feet. Well, it's nowhere to be found in the record of decision for the Tongass exemption, which is exactly the problem. That's why it's arbitrary. In the record of the proceedings. If you're done with my book, I'd like it back. I've got a lot of stuff in there. The citation for the 850 million board feet of timber in the original roadless rule is excerpts of record, page 98 in column 1. 98? Page 98 in the excerpts of record, column 1. That was part of the comments, or what was it? No, it's in the first full paragraph. There's a discussion of they're addressing their obligations under the Tongass Timber Reform Act and how it will affect market demand for timber, and it concludes with the sentence, and this is the original adopted roadless rule. So there are three paragraphs, the first one of which says, moreover.  It says, this total of 851 million board feet is enough timber volume to satisfy about seven years of estimated market demand. And that's reading from what is that? Is that a comment? No, that is the agency's. This is part of the agency's explanation for why it was adopting the roadless rule in the first place and why it included the Tongass in the roadless rule. But it's a projection. It's a projection. Projection, yeah. It turned out to be a lot more than seven years because the markets got weaker afterwards. But the point is there was this enormous volume of timber they could have drawn on to address this question of jobs. But not to be too picky. I mean, that's a statement by the agency. Where's the evidence supporting that? Is there a record that the agency says that's the case? Was there? Well, it was actually written into the rule. So the rule, the roadless rule itself contains a section that exempts timber in the Tongass that has already been the subject of a notice of intent, which is the 850 million board feet. So that provision is on excerpts of record page 116 in the third column, subparagraph D. That is an actual provision in the roadless rule that made, that ensured that there would be 850 million board feet of timber available as a transition. So 116, right-hand column? Yep. Subparagraph D. D as in dog? Yep. Can I ask you a question about the lawsuits issue? I'm looking now at the ROD, and it's page 75138 of the ROD for the Tongass exemption. It talks about adopting this final rule as reducing the potential for conflicts, regardless of the disposition of the various lawsuits. What lawsuits is that referred to? That's referring to the eight or so lawsuits that were pending in district courts around the country. And what they're talking about there is they were saying that should the, should any of those courts, you know, you could get different rulings about whether the roadless or not. Because I think you answered a question before by saying this was talking about the litigation in Alaska. And I thought the various lawsuits referenced here was to litigation around the country about the roadless rule. Am I correct? Yeah, that's right. So they were settling just the Alaska case. And the reason for that was to have a Tongass exemption that would say that regardless of the outcome of all these various lawsuits, we want the Tongass to be exempt. But that wouldn't reduce the potential for conflict, would it? No, exactly. That's exactly the point we're trying, that we've made, is that besides the fact that it was only a temporary exemption, it also ignored the agency's previous finding that the reopening of roadless areas to further logging would itself increase conflict in litigation. Isn't the best anybody could say about lawsuits is that you all will be suing each other no matter what happened? That's exactly right. And, therefore, it was arbitrary to simply look at one side of that and not the other. Realistically, is it your position, and if so, in what part of the rod or the facts are you referring, for the USDA to take the position that by settling the one lawsuit, which it says in the preamble was the reason for the settlement, that was the impetus, that it somehow was going to settle everything else or resolve everything else? There was a case, as I recall, I can't remember, Wyoming, I think Wyoming, where a district court had enjoined nationally the imposition of the roadless rule. That was then on appeal of the Tenth Circuit. They had nothing to do with that, right? I mean, there was nothing in this lawsuit or anything that they could have done at that point. It was total conjecture. Well, that's right. All they had before them was the one that had been brought by the state of Alaska. And if I may, let me point out to you what I believe was in that particular part of the rod. It's a three-part reference there. And the first part talks about, I seem to be offline here, I apologize. In any event, the first thing talked about, it was the lawsuit. It was the lawsuit brought by the state of Alaska. It doesn't mention anything else in terms of its reasons when they summarized what they were doing. Do you agree with that? The record of decision, it starts out by giving some background, so it describes the state of Alaska's case. But then the first thing it turns to when it starts explaining why it's going to adopt a temporary exemption, it's right there on ER-76 in the first column. They start talking about community road and utility connections. What I'm talking about is ER-76. It was Exhibit 24, page 2 of 11. And there's a three-part discussion as to what they do. And the first one talks about lawsuits. That talks about the Alaska lawsuit, does it not? With respect, Your Honor, actually the first thing it talks about is the serious concerns about the previously undisclosed or previously disclosed economic and social hardships that application of the rules prohibitions would cause. Maybe it's the second or third. Which is the one? Second one is comments, and third is litigation. Okay, and what does the litigation say? And it says that given the great uncertainty about implementation of the roadless rule due to the various lawsuits. That's the one you talked about. The department has decided to adopt it. And then there's a long description in the ROD of lawsuits all around the country. Yes, that's correct. Okay, our questions have taken you over time. Any further questions? Thank you, counsel. Thank you. We'll rebuttal. We'll put on two minutes. I want to address just a couple factual points. One, in answer to your question, Judge Tallman, about the ANILCA issue, the Veneman case mentioned by Mr. Waldo, it was an Alaska case. It didn't consider whether the roadless rule was applied in the Tongass, violated ANILCA. It was a case decided in the district court of Idaho, built a ninth circuit, and Alaska wasn't a party. So the ANILCA issue was never decided. The second thing I want to address is this seven-year timber supply mitigation measure in the original roadless rule. The first reason the 2003 rulemaking was a reasonable treatment of that issue is because the seven-year period was almost half up by the time the USDA was considering what to do with the Tongass exemption. The second point is that at excerpt of record 80, the USDA discusses that at the end of fiscal year 2003, there was only 193 million board feet of timber under contract, and that would be sufficient to satisfy one-and-a-half years of predicted demand. The agency states that it tends to keep enough timber supply under contract to, excuse me, satisfy three years of predicted demand in order to provide stability to the agency. And then at a later point, it goes on to say that a decision is needed now so that the industry can make the investment decisions that are needed to prevent future job losses. So if you look at the language in the Fox television station cases, the standard, that's a reasoned explanation for disregarding the so-called seven-year pipeline of timber that was in the original roadless rule. I'm sorry to ask this question so late and to interrupt you at the very end of your rebuttal. Do we have in the record how much of this timber that is harvested is sent out of the region in the form of raw logs, and how much is milled before being sent out of the region? Almost none of the timber harvested from national forest lands is shipped as whole logs. I don't know for certain, but I understand that there's a provision where timber harvested from national forests has to be processed in the United States. That's not true of timber in private lands. That's a job preservation issue, right? That is a job preservation issue, exactly, and that's why it's the national forest timber harvest that plays such a large role in these local processors' fortunes is because the amount of timber that's harvested on private lands often is just shipped overseas as whole logs. But my question was, do we have this in the record somewhere? I can't recall if it's discussed in the record. Thank you, counsel. Your time has expired. Thank you both for your arguments, and thank you all for coming down from Alaska. It's a long trip down here to Oregon for the Ninth Circuit. We will be in recess.
judges: Thomas, Pregerson, Kozinski, Fletcher, Tallman, Clifton, Callahan, Smith, Christen, Nguyen, Hurwitz